## R. BOWIE OWENS *v.* HERBERT A. WAGNER.
### [No. 40, April Term, 1932.]

*Decided June 21st, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Hall Hammond,* for the appellant.

*Alfred P. Ramsey,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

Thirty or more years ago, the appellant, R. Bowie Owens, was professor of electrical and mechanical engineering at the University of Nebraska. At that time, the appellee, Herbert

A. Wagner, now president of Consolidated Gas Electric Light & Power Company of Baltimore, was developing a single phase motor, and in connection therewith he called upon the appellant for assistance or advice. They became friends, and for some years thereafter they met frequently at conventions. Later their paths diverged. The appellant for twelve years taught engineering at McGill University, and served for fourteen years as secretary of the Barstow Research Foundation at Franklin Institute, Philadelphia. He retired from professional life in 1925, and formed a corporation called the Fox Hall Farms, Inc. Its capital consisted of two hundred and fifty shares of preferred stock, par value $100, and two hundred and fifty shares of common stock with no par value. Colonel Owens, the appellant, turned over to the corporation a farm in Anne Arundel County about fifteen miles from Annapolis, which he had bought from his grandfather's estate, of an appraised value of $15,000, in exchange for the common stock. Of the preferred stock, fifty shares were sold to Alfred Harrison, and a like number to Ralph Mojeska, each paying therefor the sum of $5,000. Five other shares of the preferred stock were sold to General Squires for the sum of $500. Colonel Owens personally bought eighty shares of preferred stock for $8,000, and fifty shares of the same for $5,000 for a trust, he being the trustee.

The corporation was formed with the object and purpose of conducting a nursery.

In March, 1929, Colonel Owens happened to meet Mr. Wagner at luncheon in one of the hotels in Baltimore City. They recognized each other, and their friendly relations were renewed. The appellant told the appellee his life story since their separation years before, including the fact that he had formed the corporation mentioned, and was at that time living at the farm upon which he was conducting the nursery. The two men saw each other frequently thereafter, and on one of these occasions the appellant told the appellee, as stated by the latter, that he had "issued some stocks to some of his friends from whom he borrowed money but that he could not

seem to get any more money and he needed a little help—he wanted me to go down to see the place, which I eventually did. It was then in March." Speaking of Colonel Owens, Mr. Wagner said: "He did not know anything about business of any kind, the transaction of business, and that is why he wanted to lean on me for advice to help him and to further finance the proposition."

On April 2nd, 1929, Mr. Wagner gave to Colonel Owens a check for $1,000, which, upon the request of the latter, was made payable to Fox Hall Farms, Inc. This check was carried by Colonel Owens to the secretary of the corporation, and the latter was requested to issue a certificate for ten shares of the preferred stock of the corporation to him (R. Bowie Owens). This was done the following day, April 3rd, 1929. On April 18th, the certificate for the ten shares so issued to Colonel Owens was canceled and upon his direction a certificate for ten shares of the stock was issued to Mr. Wagner. This certificate the appellant carried to Mr. Wagner's office and delivered to his secretary, Mr. Sharrett. On April 2nd, 1929, after the delivery of the check of $1,000 to Colonel Owens by Mr. Wagner, the former delivered to the latter two certificates, one for eighty shares of preferred stock, and the other for two hundred shares of common stock, in the Fox Hall Farms, Inc., which stock he had caused to be put in the name of Mr. Wagner. On April 24th, 1929, six days after the delivery of the ten shares of preferred stock issued to Mr. Wagner, and twenty days after the eighty shares of preferred and two hundred shares of common stock had been left with him, Mr. Wagner gave to Colonel Owens a writing signed by him, which is as follows:

"Memorandum in Reference to Stock of the Fox Hall Farms, Inc.

"On April 2, 1929, there was handed to me by Colonel R. B. Owens 80 shares of Preferred and 200 shares of Common stock of Fox Hall Farms, Inc., issued in my name.

"This stock is now endorsed by me in blank and will be held by me as agent for Colonel R. B. Owens for his sole interest and subject to his order.

"A copy of this memorandum has been delivered to Colonel Owens.

"[Signed] Herbert A. Wagner.

"Witness: Harry A. Sharrett.

"Date: April 24, 1929."

Mr. Wagner, after advancing at different times to the corporation an amount aggregating $6,000, refused to advance more money in the reorganization of the corporation.

Some months after April 24th, 1929, Mr. Wagner advanced to Colonel Owens the sum of $300 to reimburse the latter for certain personal expenditures in connection with the Maryland Academy of Music, for which Colonel Owens gave him his promissory note. This note, or the renewal of it, was not due at the time of the filing of the bill in this case, and did not become due until May 15th, 1932.

In the fall of 1929, Mr. Wagner became ill and was unable to look after his business affairs for a period of several months. His secretary, Mr. Sharrett, upon being told that the corporation was going to mortgage its land to raise additional money, insisted that a mortgage be given to Mr. Wagner to secure the advancement of the said $6,000, which was done. This mortgage was subsequently paid in full. Thereafter Colonel Owens demanded the return to him of the two hundred shares of the common and the eighty shares of the preferred stock of the Fox Hall Farms, which he had left with Mr. Wagner on April 2nd, 1929. Mr. Wagner refused to return the stock until Colonel Owens had paid to him the amount of the check of April 2nd, 1929, $1,000, with interest, which he regarded as a loan, as well as the personal loan to Colonel Owens of $300. After this refusal, Colonel Owens demanded of Mr. Wagner, as the record holder, though not the actual holder, of the stock, a proxy for said stock in order that he might vote it at the following annual meeting. This demand was likewise refused. Whereupon the bill in this case was filed.

The bill prayed (1) that Mr. Wagner be ordered to issue a proxy to Colonel Owens authorizing the latter to vote the two hundred shares of common stock standing in the name of

Herbert A. Wagner; and (2) that Mr. Wagner be ordered and decreed to return to Colonel Owens properly indorsed for transfer the certificates for the eighty shares of preferred stock and the two hundred shares of common stock which had been left with Mr. Wagner on April 2nd, 1929, as above mentioned. As disclosed by the answer, Mr. Wagner issued and delivered to Colonel Owens said proxy after the filing of the bill, and the same was voted, as alleged therein, at a meeting of the stockholders, February 6th, 1932, for the election of the directors of the corporation.

Evidence was heard upon the bill and answer filed, and the court, by its decree of February 20th, 1932, dismissed the bill and decreed that the cost be equally divided between the parties. This disposition of the cost, it was said, arose from the fact that the defendant had failed to issue the proxy to vote the stock when he should have done so. It is from the order or decree so passed by the court that this appeal was taken.

The decision in this case depends upon the determination of the questions, (1) Was the check, delivered to Colonel Owens by Mr. Wagner, dated April 2nd, 1929, for $1,000, payable to the Fox Hall Farms, Inc., a loan to Colonel Owens, or was it in payment of ten shares of the preferred stock of that corporation, purchased by Mr. Wagner? and (2) If it was a loan from Mr. Wagner to Colonel Owens, were the eighty shares of preferred stock and the two hundred shares of common stock of the corporation left with Mr. Wagner a pledge for the payment of that loan, or for the payment of it and the said personal loan of $300 to Colonel Owens?

It is contended by Colonel Owens that the $1,000 check, dated April 2nd, 1929, payable to the corporation, and on that day delivered to him, was in payment of ten shares of the preferred stock of the corporation, which Mr. Wagner had agreed to purchase; while it is contended by Mr. Wagner that the check was not given in payment of any stock purchased by him, but was a loan to Colonel Owens or the corporation; and that the eighty shares of preferred stock

and the two hundred shares of common stock were left with him as a pledge for the payment of said indebtedness of $1,000, as well as any future loans that might thereafter be made to Colonel Owens or the corporation.

Upon the issue whether or not the $1,000 check was a loan from Mr. Wagner to Colonel Owens or the corporation, the latter testified that, on one occasion when he called on Mr. Wagner, he named to him those who had subscribed to the corporation stock and the amounts subscribed by them, and he also told Mr. Wagner of the corporation's need of money to continue the operation of the nursery. In reply to a request from Colonel Owens for financial aid and assistance in connection therewith, Mr. Wagner asked if $1,000 would help him, and he said it would. Without going more fully into the conversation, as related by the appellant, he further testified that Mr. Wagner then and there agreed to subscribe $1,000 to the stock of the corporation, and in payment therefor gave Colonel Owens his check for that amount, payable to the corporation. Colonel Owens delivered this check to Mr. Hall, the corporation's secretary. He was not clear in his recollection whether he directed Mr. Hall to issue the stock to him, although Mr. Hall said he did. The latter, thinking it should be issued to Mr. Wagner, wrote Colonel Owens suggesting that the stock be made out in the name of Mr. Wagner. The appellant, however, testified that the meaning of Mr. Hall's letter was not clear to him, but a few days later, when he discovered the mistake he had made in not having the stock made out to Mr. Wagner, the certificate to him was canceled and a new one issued in the name of Mr. Wagner. The new certificate was then delivered to Mr. Wagner's secretary, who, it seems, was intrusted by Mr. Wagner with much of the details of his dealings with Owens and the Fox Hall Farms, Inc., and who subsequently became the treasurer of the corporation. This certificate remained in the custody of Mr. Sharrett, Mr. Wagner's agent, through all the subsequent dealings between Mr. Wagner and Colonel Owens, and it is still so held, so far as the record discloses.

Mr. Wagner testified that Colonel Owens came to him, and,

after telling him of his troubles and the corporation's need of money to continue the nursery business, asked him for financial aid or assistance, and said that he had stock that could be sold. Mr. Wagner said he did not want to buy any stock; that he did not care to become personally interested in the nursery business, as he did not know anything about it and would not have time to give it any attention, nor had he any desire to become interested in it, but, if he could help out by a personal loan, he would be very glad to do so. It was then that he gave Colonel Owens the check for $1,000, made out at the latter's request to the Fox Hall Farms, Inc. There was no evidence taken of the alleged loan; that is, no note or written memorandum of any sort. It will thus be seen that the testimony of the two parties on this question is contradictory in the extreme.

There were a number of loans subsequently made by Mr. Wagner to either Colonel Owens or the corporation, for which notes were in every instance given to secure their payment. But, as to this alleged loan of $1,000, no security or evidence whatever was demanded or taken, nor was this loan considered or included in the mortgage executed to secure the subsquent loans. Mr. Wagner attempted to explain why this loan was not included in the mortgage debt by saying that the arrangement for the execution of the mortgage was made by his secretary, and he knew nothing of it at the time, although, after his recovery, Mr. Wagner must have been told of the execution of the mortgage to secure the subsequent loans therein mentioned. If so, he would naturally have asked about the $1,000 loan, if he regarded it as a loan, and learned why it was not included in the mortgage. He said he never knew of the existence of the certificate for the ten shares of the stock of the corporation made out in his name, which was in the possession of his agent, until a few days before he testified in this case. But he did know of the alleged loan, and knew it was not included in the indebtedness secured by the mortgage. It would seem that no inquiry was made by him relative to this loan, otherwise he would have been told by the secretary that the $1,000, which was

regarded by him as a loan, was treated by Colonel Owens as a payment of the purchase money for ten shares of the stock of the corporation, and that a certificate had been issued to Mr. Wagner to that effect, and was at the time in his secretary's possession.

This evidence, we think, is rather conclusive of the fact that the $1,000 check, payable to the corporation and delivered to Colonel Owens by Mr. Wagner, was for stock of the corporation subscribed to by Mr. Wagner, as stated by Colonel Owens, and not a loan either to him or to the corporation. But, if it were to be otherwise held, the evidence found in the record is insufficient to show that the eighty shares of the preferred and the two hundred shares of the common stock were left with Mr. Wagner as a pledge for such loan. Mr. Wagner testified that, at the time of his delivery of the $1,000 check to Colonel Owens, which he (Mr. Wagner) claimed was a loan, no memorandum in writing, in the nature of a note or otherwise, was taken to secure it, nor was there anything said in relation thereto. It was upon Colonel Owens' return to his office on the same day that he voluntarily, and without the previous knowledge of Mr. Wagner, brought with him the eighty shares of the preferred and the two hundred shares of the common stock made out in Mr. Wagner's name and left them with Mr. Wagner.

Colonel Owens, when asked for what purpose he delivered the two hundred shares of common stock and the eighty shares of preferred stock of Fox Hall Farms, Inc., to Mr. Wagner, replied: "To assist Mr. Wagner in a promised effort to refinance the company. Q. To assist him in what way? A. Well, Mr. Wagner had seen the property and reports on it and he felt it ought to be gone into in a larger way than I was able to go into it. The little savings I had, * * * I had put in it, but it was not enough money and Mr. Wagner thought a success could be made of it if new money was found at the rate of $10,000 a year for four years, but he pointed out to me in the refinancing of it that I would lose controlling interest in the company. As he figured it out, I would have remaining thirty-eight per cent. interest in the

company. Well, that was perfectly agreeable to me, because if he put this amount of money in, if he had been able to find this money and put in it * * * thirty-eight per cent. of the new stock probably meant more to me that the controlling interest in the present company."

There was offered in evidence, in connection with this testimony of Colonel Owens, the memorandum in the handwriting of Mr. Wagner, in which he had figured out that, upon a reorganization of the corporation on the plans stated, Colonel Owens would have thirty-eight per cent. of the stock. The witness, when again asked concerning the purposes for which the stock was left with Mr. Wagner, testified that "it was delivered to him to do what he said in connection with the reorganization of the company," and this was perfectly understood.

Mr. Wagner, in relation to the delivery of the certificates mentioned, testified that, when the certificates were brought to him by Colonel Owens, he asked: " 'What is this stock for?' And Colonel Owens said: 'It is to secure you for the advance you have made of $1,000, for anything else you may help me out in this undertaking and possibly in connection with the reorganization, if that seems to be necessary; I am anxious to refinance the company, at least I am anxious to get more money for further extensions or enlargements of this nursery business, and I would like to have your help.' I said, 'If I can be of any help to you in getting anybody interested in it, if upon investigation, it looks like a profitable venture, I will be glad to give you what help and assistance I can; but personally I do not want to invest any money in it.' He left his stock with me, and either on the same day or following day, I addressed a note to him as a receipt for the stock and telling him that I would hold it for his account, subject to his order. * * * He asked me afterwards * * * why I had done that. I said, 'Bobbie, you tell me this is all you have in the world, what is evidenced by these stock certificates, while I am glad to help you, and I will hold it as collateral for what I have already advanced you.' * * * I told him that I wrote him as I did, realizing it might repre-

sent a good deal of value; at any rate, it was all that he had, and if anything happened to me while the certificates were in my possession or in my name, there would not be any evidence at all that he had any interest in them and he would have no opportunity to recover, so that I preferred to endorse them and hold them so that if anything happened they would appear to be his."

Mr. Wagner's attention was then called to the memorandum or receipt for the shares of stock left with him by Colonel Owens, which he said he had sent to the latter. He said: "I recognize the memorandum as being in my handwriting and I could not state the date on which this memorandum was made, but it was probably after the first thousand dollars advanced by me to Colonel Owens and it was probably at luncheon, because I do not recognize the paper on which it is written. It is not any of my office paper. It was probably made at the Southern Hotel, where we lunched several times. As I recollect it, Colonel Owens was again pressing the matter of raising more money for the enlargement of his project there, and trying to interest other people in investing in some kind of security for the project. This recalls * * * to my mind that I asked him at that time how much money he had put in the place, and then he told me that several of his friends had helped him out and let him have some money." The names of these parties and the amounts received from them were stated to Mr. Wagner, and also the fact that they had subscribed to the stock of the corporation for the amounts received from them.

On cross-examination, Mr. Wagner testified that Colonel Owens asked him to help in "financing it (the corporation) and he told me he would leave this stock with me for any purpose I chose to use it for. Q. Did you ever lend him any money on the security of that stock? A. I have always considered it was security for this $1,000." At another time Mr. Wagner testified saying: "I feel that he gave me that stock as security for anything I had advanced him that had not been taken care of directly in some other way."

The burden was upon Mr. Wagner, the appellee, to show

that the certificates of eighty shares of the preferred stock and the two hundred shares of the common stock of the Fox Hall Farms were left with him as a pledge for the payment of the alleged loan of $1,000 and the personal loan of $300 to Colonel Owens. *May Oil Burner Corp. v. Munger,* 159 Md. 618, 152 A. 352.

Upon the first visit of Colonel Owens to the office of Mr. Wagner on April 2nd, 1929, when the check of $1,000, payable to the Fox Hall Farms, was delivered to Colonel Owens by Mr. Wagner, no memorandum in writing was taken nor security given for the alleged loan, as conceded by Mr. Wagner. On the same day, Colonel Owens made a second visit to Mr. Wagner's office and left with him the certificates of stock made out in Mr. Wagner's name, to be used if needed, as he said, in the reorganization of the corporation, and not as a pledge for the security of any money advanced or to be advanced by Mr. Wagner to him or the organization. Mr. Wagner testified that the certificates were left as a pledge for the advancement of the thousand dollars as well as for other advancements he might thereafter make to Colonel Owens or the nurseries, though he admits that they were left there to be used by him if needed in the financing or reorganization of the corporation.

If it was understood by the parties that the stock was so left with Mr. Wagner, he, in the memorandum written by him nearly a month later, made no mention of such pledge, but, on the contrary, he therein stated that he held it as "agent for Col. R. B. Owens for his sole interest and subject to his order," a statement wholly inconsistent with his claim that it was left with him as a pledge for moneys advanced or to be advanced to Colonel Owens or his corporation. And it cannot be properly inferred from other facts found in the record that the stock was left with Mr. Wagner as a pledge.

We have not passed upon the exception to the admissibility of the evidence of Mr. Wagner as to the object and purpose for which the stock was left in his hands, which, as claimed by the appellant, was in violation of the rule against the introduction of parol evidence to contradict a written instru-

ment, as our conclusion would not be affected thereby, inasmuch as we think, with that evidence in, the appellant is still entitled to the relief he is asking.

From what we have said, we are forced to the conclusion that the court was in error in dismissing the bill, and the decree appealed from will be reversed, and the case remanded for further proceedings.

*Decree reversed, and case remanded, for further proceedings in conformity with this opinion; appellee to pay the costs.*